# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JAMANE K. STUBBLEFIELD,** | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) **Case No. CIV 13-062-RAW-KEW** |
| | ) |
| **JERRY CHRISMAN, Interim Warden,** | ) |
| | ) |
| Respondent. | ) |

## **OPINION AND ORDER**

This matter is before the court on Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate currently incarcerated at Oklahoma State Penitentiary in McAlester, Oklahoma, attacks his convictions and sentences in a nonjury trial in Carter County District Court Case No. CF-210-218 for First Degree Burglary (Count I) and First Degree Felony Murder (Count II). He raises the same five grounds that were presented on direct appeal to the Oklahoma Court of Criminal Appeals (OCCA):

I. The evidence was insufficient to prove Burglary in the First Degree was committed, in violation of Petitioner's due process rights guaranteed by the Fifth and Fourteenth Amendments and Art. II, § 7, of the Oklahoma Constitution.

II. Petitioner's convictions for First Degree Burglary and First Degree Murder violate Okla. Stat. tit. 21, § 11.

III. The evidence was insufficient to prove Petitioner committed Murder in the First Degree, in violation of his due process rights guaranteed by the Fifth and Fourteenth Amendments and Art. II, § 7, of the Oklahoma Constitution.

IV. Petitioner's sentences are excessive under the facts and circumstances.

V.	The cumulative effect of all the errors deprived Petitioner of a fair trial.

The respondent concedes that Petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review. The following records have been submitted to the court for consideration in this matter:

A.	Petitioner's direct appeal brief.

B.	The State's brief in Petitioner's direct appeal.

C.	Summary Opinion affirming Petitioner's judgment and sentence. *Stubblefield v. State*, No. F-2011-432 (Okla. Crim. App. May 2, 2012).

D.	State court record.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Facts**

This case arises from the burglary, robbery, and murder of Eric Knight on April 19, 2010. Derrick Knight was at his brother Eric Knight's house, watching television in the living room with Eric and Victor Dokes. (Tr. I 36-37). Eric's roommate Corey Stoughtenborough and Corey's girlfriend Natasha also were present. (Tr. I 60-61).

Suddenly, the front door was kicked in, and three men carrying weapons and wearing dark clothes and ski masks burst inside. (Tr. I 36-38). One man was carrying an AK-47, a second man had a 9 mm handgun, and the third was carrying an "old-school oozy" with a laser sight. (Tr. I 38-40). Derrick testified that the man with the AK-47 looked at him, and Derrick could see the skin under his eyes. (Tr. I 44). Derrick also heard the man's voice, and Derrick felt he knew him. (Tr. I 44). The next day Derrick realized the man was Petitioner. (Tr. I 44, 55-56). Derrick knew Petitioner's family, and Petitioner's mother had babysat Derrick's child. (Tr. I 57-58).

The intruders demanded money and cell phones, and the victims gave them everything they had. (Tr. I 40). The men then made the victims drop their pants and get on the floor. (Tr. I 40). Eric, Derrick, and Victor complied with all the intruders' orders, but they demanded more. (Tr. I 40). Derrick was sitting with his hands up, and when he put his head down, he felt the 9 mm gun at his head. (Tr. I 42, 50).

Eric said, "Man, I got a bag in my room in there." (Tr. I 40). One of the intruders replied, "Well, let's go get it." (Tr. I 40). Eric and the man with the AK-47 went to the back and returned to the living room. (Tr. I 40-41, 44). The man with the AK-47 then said, "No, no, no. I know it's more than this in here. I know it's more than this." (Tr. I 41). Eric told him, "Man, that's it. That's all we got. That's it." (Tr. I 41). Eric pleaded four or five times, "Man, please don't kill anybody. Please don't kill anybody." (Tr. I 41).

Derrick then heard shots ring out. (Tr. I 42). He immediately jumped up and ran out the front door to his car across the street. (Tr. I 42-43). He saw Victor run out the door but did not see Eric. (Tr. I 43). When Derrick ran back inside, he found Eric lying dead on the floor. (Tr. I 43).

3

Crime Scene Investigator Jack McKelvy testified that Eric suffered a massive gunshot wound to the head, a bullet wound to his chest, and one to his thigh. (Tr. I 127; State's Exhibits 47-51). Because all the entrance wounds were small and the exit wounds were large, the wounds were consistent with a high velocity round fired from an AK-47. (Tr. I 127-29).

Corey Stoughtenborough testified that he was in his bedroom that night when he heard a loud noise. (Tr. I 61). He came out of the bedroom and saw a man dressed all in black. (Tr. I 61-62). He turned around and told Natasha to leave, and she went out the back door. (Tr. I 61, 63). The man pulled a handgun with a long clip on Corey, dragged him to the doorway into the living room, pulled down Corey's pants, and took his phone. (Tr. I 62-63). Corey saw another man with a weapon like a rifle with a curved "banana" clip and blue tape around it. (Tr. I 64). Corey was left lying face down on the floor, Eric was on the loveseat, and Victor and Derrick were on the couch. (Tr. I 63). After he heard the gunshots, Corey got up and ran toward the back to look for Natasha. (Tr. I 70). He went back to the front, saw Eric on the floor, and left by car. (Tr. I 70). Although he did not identify Petitioner, Corey testified that the lighter-complexioned man holding the AK-47 was the one who walked Eric back to the bedroom. (Tr. I 66-68).

When Mike Murillo testified at Petitioner's trial, he was serving a sentence for his part in the robbery leading to Eric Knight's murder. (Tr. I 78). He testified that on the day of the murder, he and Barnard Brown discussed robbing Eric and getting marijuana from him. (Tr. I 79-80). Murillo also testified that Brown had guns at his house. (Tr. I 80).

That evening, Brown got R.J. Dobbs to drive him and Murillo by Eric's house. (Tr. I 80-81). They saw the door to the house was open, but Dobbs got scared and backed out of

4

the plan. (Tr. I 81-82). On their way back to Brown's house, they saw Petitioner in the back of a truck by the community center, which was across the street from Brown's house. (Tr. I 83). They then saw Niko Sweetland driving his SUV, and Brown stopped him. (Tr. I 82). Sweetland followed them back to Brown's house where Brown asked if Sweetland could drop them off by Eric's house. (Tr. I 82).

About this time, Petitioner arrived at Brown's house and spoke with Brown. (Tr. I 84). Brown asked who wanted the AK-47, and Petitioner took it. (Tr. I 86). Brown got in the front seat of Sweetland's SUV, armed with the 9 mm handgun. (Tr. I 86-88). Murillo carried the MAC-10, and Petitioner had the AK-47. (Tr. I 84-85). Petitioner and Murillo wore masks as Sweetland drove them to Eric's house. (Tr. I 87). When they approached Eric's house, the three passengers exited the SUV. (Tr. I 88). Murillo entered Eric's house first, with Petitioner and Brown behind him. (Tr. I 88-89). Murillo testified they planned to steal marijuana from Eric, but they also took cell phones, a wallet, and money. (Tr. I 89-90). Murillo took approximately $2,000 for himself. (Tr. I 90).

Murillo further testified that he never left the living room, and he saw Eric go to the back and come back out. (Tr. I 90-91). He saw Petitioner and Eric struggle with the gun, with Eric throwing Petitioner against the wall and trying to take the gun from Petitioner. (Tr. I 92-93). Murillo heard gunshots, and he, Brown, and Petitioner ran back to Brown's house. (Tr. I 93-95). When Petitioner went into Brown's house, he began "wigging out" and "didn't know what was going on," appearing scared about what had happened. (Tr. I 96). Brown then drove Murillo to Shelbie Burton's apartment, where they stayed a while until Murillo went home. (Tr. I 97).

5

Shelbie Burton testified that on the night of the murder, her boyfriend Barnard Brown was at her apartment when he told her to go to his house and get his gun. (Tr. II 321, 323, 328). She identified State's Exhibit No. 13 as Brown's 9 mm handgun that she retrieved and gave to him that night. (Tr. I 324). When she returned to her apartment, she found Brown and Murillo sitting on the couch. (Tr. II 324-25). Petitioner arrived a little later, and the three men went to a room to talk. (Tr. II 325-26). Burton was smoking a cigarette on the porch when she heard Petitioner say, "There's a hole in the back of his head and I think I killed him." (Tr. II 326). Burton asked, What'd you just say?" (Tr. II 326). Petitioner replied, "Nothing. Mind your own business." (Tr. II 326).

Burton further testified that she hid Brown's gun in a friend's shed, and the friend put it in a safe. (Tr. II 324-25). The police confiscated Brown's black pants, black hoodie, and his marijuana from her apartment. (Tr. II 336). Burton admitted to police that the marijuana and the black clothing belonged to Brown. (Tr. II 337).

Petitioner's defense was that (1) someone else committed the crimes, or (2) if he was at the crime scene, Corey Stoughtenborough gave him permission to enter the house and rob them, or (3) a struggle over the gun ensued between Petitioner and Eric Knight, and the crime was only second degree murder.

**Grounds I and III: Sufficiency of the Evidence**

Petitioner disputes the sufficiency of the evidence to support his convictions. The OCCA denied relief on his burglary conviction, finding that "reviewing the evidence in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that Appellant committed the crime of first degree burglary." *Stubblefield v. State*, No. F-2011-432, slip op. at 2 (Okla. Crim. App. May 2, 2012) (citations omitted). The OCCA

6

made the same determination regarding Petitioner's general challenge to the sufficiency of the evidence to support his conviction for felony murder. *Id.*, slip op. at 3.

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

***First Degree Burglary***

To determine whether there was sufficient evidence presented at trial to sustain

7

Petitioner's conviction for first degree burglary, the court first must look to Oklahoma law for the elements required for the crime. *See Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). The elements of first degree burglary are (1) breaking, (2) entering, (3) a dwelling, (4) of another, (5) in which a human is present, (6) with intent to commit some crime therein. *See* Okla. Stat. tit. 21, § 1431; OUJI-CR (2d) 5-12. As in his direct appeal, Petitioner challenges the element of "breaking," alleging there can be no breaking if there is consent. He claims Corey Stoughtenborough, who lived at the residence, gave Petitioner consent to enter.

In Oklahoma, consent is a defense to burglary. *Roberts v. State*, 29 P.3d 583, 587-88 (Okla. Crim. App. 2001). The OCCA, however, clarified the issue of consent in *Roberts*:

> . . . If the State has put on sufficient evidence of the use of force to obtain entry, a burglary conviction can be upheld even if the defendant puts on some evidence that he had permission to enter the relevant premises. As this Court has previously recognized, whether the defendant has committed a "breaking" under such circumstances is a question of fact for the jury. In addition, direct evidence of a lack of consent to enter is not necessary to sustain a burglary conviction, even where the defendant claims permission to enter, where the circumstances of the entry provide circumstantial evidence that such consent was not given. Circumstantial evidence can be used to prove a lack of consent, just as it can be used to prove some use of force to obtain entry.

*Id* at 588 (footnotes omitted).

Here, the court finds there was no evidence of consent to enter. Corey Stoughtenborough testified that he never gave the three men permission to enter and rob them. (Tr. I 70). There was no testimony that Stoughtenborough gave Petitioner or any of the other two men consent enter the house, nor was there any evidence that any of the other victims consented in any way to Petitioner's entry into the house.

8

There was, however, evidence of the force used to enter the residence when the front door was kicked in. Eric's younger brother Derrick testified he was at the residence watching television when the door suddenly was kicked in, and three men carrying weapons and wearing dark clothes and ski masks entered. (Tr. I 36, 38). Investigator McKelvy testified he found the broken striker plate from the front door laying on the floor, along with the screws that had held the striker plate in place. (Tr. I 119, 121, 124). That evidence indicated the door had been forced open. (Tr. I 124).

The court, therefore, finds there was sufficient evidence under the standards of *Jackson v. Virginia* that petitioner committed the crime of first degree burglary. The court further finds the OCCA's determination of this claim was not contrary to, or an unreasonable application of, federal law. U.S.C. § 2254(d). In addition, the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence presented at trial. U.S.C. § 2254(d)(2). This claim for habeas corpus relief fails.

***First Degree Felony Murder***

The elements of first degree felony murder with the underlying felony of Robbery with a Dangerous Weapon are (1) the death of a human; (2) the death occurred as a result of an act or event which happened in the commission of robbery with a dangerous weapon; (3) caused by the defendant while in the commission of a robbery with a dangerous weapon; (4) wrongful; (5) taking; (6) carrying away; (7) personal property; (8) of another; (9) from the person or immediate presence of another (10) by force or fear; (11) by use of loaded/unloaded/imitation firearm, or other dangerous weapon. *See* Okla. Stat. tit. 21, § 701.7(B); Okla. Stat. tit. 21, § 801.

9

To the extent Petitioner has raised a general challenge to the evidence for first degree felony murder or the credibility of witnesses, Petitioner was identified as being at the crime scene. Numerous witnesses also placed Petitioner with his accomplices before and after the crimes were committed.

Lance Barney testified he was at Brown's house with Petitioner, Brown, and James Fields on the morning of the crimes. (Tr. I 182). Barney was there to buy marijuana, but Brown did not have any. (Tr. I 182, 185). Barney also testified that there always were guns in Brown's house, but Barney specifically saw an AK-47 in a corner by the door and a pistol laying on an entertainment center. (Tr. 182-83). Brown was talking to Petitioner, Fields, and Barney about robbing someone, and Brown asked Barney if he wanted to make some money. (Tr. I 183-84). Barney left the house, but returned in the early evening in another attempt to get marijuana, and Brown said he might have some later. (Tr. I 185-86). Barney knew something bad was going to happen, because he saw a blue bulletproof vest on the couch. (Tr. I 186-87). Realizing the circumstances, Barney caught a ride and left. (Tr. 186).

Toni Conway also saw Petitioner at Brown's house that night, handling guns with Brown, Murillo, and her cousin R.J. Dobbs, and preparing to rob Eric Knight. (Tr. I 201-05). Conway and Dobbs were at Brown's house to purchase marijuana from Brown. (Tr. I 202). Brown and Murillo were wearing black with masks and hats with holes, and they looked as though they were going to rob someone. (Tr. I 203-04). Brown, Murillo, and Dobbs left in Conway's car, but came back very quickly. (Tr. I 204). Toni insisted on leaving with R.J. when she saw how scared he looked upon his return. (Tr. I 206). When Conway and R.J. left, she saw a very dark Suburban outside. (Tr. 204). She could not, however, identify who got into the Suburban. (Tr. 207).

10

Niko Sweetland testified that on the night of the murder, he and his girlfriend were on their way to Brown's house in Sweetland's black Suburban to get marijuana from Brown. (Tr. I 208, 211). After discovering Brown was not home, they drove away, only to meet Brown driving a blue sedan. (Tr. I 209). When the two cars met, Brown got out of his car and told Sweetland to meet him back at his house. (Tr. I 209). He was dressed all in black with a bandanna around his neck. (Tr. I 211). At Brown's house, Brown got out of his vehicle and leaned through Sweetland's vehicle window with a pistol. (Tr. I 210-11). Sweetland asked Brown if he had or could get some marijuana." (Tr. I 210). Brown said, "No. I'm fixing to go get some right now. Give me a ride." (Tr. I 210).

Brown instructed Sweetland's girlfriend to get out of the Suburban and wait in his house, and he told Sweetland to give him a ride. (Tr. 210-11, 213). He walked around from the driver's side of the vehicle and got in the passenger's seat. (Tr. I 211). Two other men, also dressed in black with masks, got in the back seat. (Tr. I 211). They left Brown's house, and Sweetland dropped them off as Brown instructed, then drove away. (Tr. 211-12). Brown left his cell phone in the glove box of the Suburban. (Tr. I 212).

When Sweetland returned to Brown's house, he heard gunshots, and one of the women at the house told Sweetland to go check on the men. (Tr. I 214). He drove around looking for them, and saw Brown's white Caprice with a man in the passenger's seat. (Tr. I 214-16). He guessed that Brown had dropped off the third man. (Tr. I 216). He met Brown's car, handed his phone through the window, and asked if he had gotten the marijuana. (Tr. I 215-17). Brown said, "Yes. Meet me over at the apartments," meaning Shelbie Burton's apartment. (Tr. I 217).

11

When Sweetland and his girlfriend got to the apartment, Brown and Murillo were there. (Tr. I 217). Both were sweaty and wearing white tank tops. (Tr. I 217-18). Wallets, cell phones, and money were on the table. (Tr. I 218). Brown pulled out some marijuana from underneath the table, put it in a bag, and handed it to Sweetland. (Tr. 218). Sweetland testified that Brown said, "I shot that guy in the face." (Tr. I 221). Sweetland did not pay for the marijuana and left after receiving it. (Tr. I 218).

Derrick Knight identified Petitioner as the "lighter-complected" guy who held the AK-47 with a banana clip and walked his brother Eric back to the bedroom. (Tr. I 67-68). He did not see or hear a struggle. (Tr. I 43). Corey Stoughtenborough also described the intruder with the rifle and banana clip as light-complexioned. (Tr. I 67-68). Stoughtenborough identified State's Exhibit Nos. 10 and 12 as the AK-47 and the banana clip with blue tape that Petitioner held during the robbery. (Tr. I 65, 85). He also testified that there was no struggle before the gunshots. (Tr. I 69).

There were several other witnesses present after the crimes were committed. Malinda Madrigale was outside Brown's house when she saw Brown and two other men come running from around the corner. (Tr., II 231-32). All three men were dressed in black and out of breath. (Tr. 231-32). Brown was not wearing a mask, but the other two men were wearing masks. (Tr. II 231-32).

Kristen McGehee testified that on the day of the murder, she and her friend Shelby Miller went to Brown's house. (Tr. II 244). Brown was inside the house, and Murillo was outside. (Tr. II 244). McGehee asked Murillo if they could hang out there, and he said they were about to do something. (Tr. II 244). Brown came outside and told McGehee to wait inside the house until they returned, so McGehee and Miller went in the house. (Tr. II 245).

12

Sweetland returned to the house, seeming somewhat shocked and panicked, and then Brown, Murillo, and Petitioner followed, all dressed in black. (Tr. II 246). Petitioner was running back and forth inside the house, taking off his hoodie and sweatshirt. (Tr. II 247, 252-53). McGeehee saw and heard him say, "That nigga's dead. That nigga's dead. He got shot twice in his head." (Tr. II 247).

Shelby Miller testified that when she saw Petitioner come in the house, he looked scared. (Tr. II 272). She heard Petitioner say, "He's dead" and "He got shot." (Tr. II 275). Petitioner also yelled to everyone that they "didn't hear any of this or see it or anything." (Tr. II 275).

Tristin Rushing testified that a man in a black Suburban showed up at her house and said he was supposed to pick up Brown. (Tr. II 297-98). He left, but returned with Petitioner, Brown, and Murillo. (Tr. II 298). Petitioner, Brown, and Murillo were dressed in black and "hollering about putting guns up." (Tr. II 298). Brown gave her two guns to put away. (Tr. II 298). One was the AK-47 and the clip she identified at State's Exhibit Nos. 10 and 12. (Tr. II 295, 298-300). Brown and Murillo told her someone had been shot, so she put the guns in Space Bags and buried them in Springer, Oklahoma. (Tr. II 301-02).

Walisha Kemp, Petitioner's girlfriend and the mother of his child, testified that on the night of the murder, she arrived at the house they shared before 9:30 p.m., and Petitioner was taking a shower. (Tr. II 340-43). They went to Petitioner's father's house, arriving before the 10:00 p.m. news. (Tr. II 343). She was on the internet, and Petitioner was outside playing with his little brother. (Tr. II 347). The respondent contends that Petitioner could have slipped away from his father's house while Walisha was using the computer, and he could have gone to Burton's nearby apartment, especially if she "fudged" a little on her

13

timeline.

Although Toni Conway and Niko Sweetland could not or would not definitively identify Petitioner as getting into the Suburban, Mike Murillo did positively identify him and testified that the plan was to steal marijuana. (Tr. I 88-89). Murillo testified that he, Brown, and Petitioner, armed with their loaded weapons, demanded and took money, cell phones, and a wallet. (Tr. I 89-90). The police recovered a large bag of marijuana in the yard of the house next to Eric Knight's home. (Tr. I 115). The police also found a duffel bag in the center bedroom of Eric's house that appeared to contain a small amount of loose marijuana. (Tr. I 125).

Petitioner's only evidence was the testimony of his friend James Fields, who testified he and Petitioner were "like brothers," and he did not want to get Petitioner in trouble. (Tr. II 353, 357). Fields also testified that on the day of the murder, he went to Barnard Brown's house where Brown and Corey Stoughtenborough talked to him about robbing Eric Knight of money and marijuana. (Tr. II 351-52). Fields left when he heard the plan, because did not want to get involved. (Tr. II 352-53).

Viewing the evidence presented at trial in the light most favorable to the State, the court finds any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Furthermore, the court finds the OCCA's determination of this issue was consistent with federal law. *See* 28 U.S.C. § 2254(d). Ground III of this petition is meritless.

**Ground II: Double Punishment**

Petitioner argues in Ground II that his convictions for first degree burglary and first degree felony murder violated Oklahoma's double punishment statute, Okla. Stat. tit. 21, §

11 (2001).

> Section 11 applies when "a single criminal act gives rise to offenses which are not separate and distinct, are a means to another ultimate objective, are lesser included offenses, or are incidents or facets of some other offense." *Hale v. State,* 888 P.2d 1027, 1029 (Okla. Crim. App. 1995). The test is "whether, taken as a whole, a defendant has been punished twice for one criminal course of conduct where his offenses were incident to one objective." *Id.* When the "criminal course of conduct" consists of a singular act that violates two criminal laws, § 11 clearly applies. *See id.* at 1030 ("In promulgating § 11 our legislature expressed its clear intention that, where an act or omission is punishable under different statutes, a defendant may only be punished once for the single act.").

*Cummings v. Evans*, 161 F.3d 610, 615 (10th Cir. 1998), *cert. denied*, 526 U.S. 1052 (1999).

The OCCA reviewed the claim for plain error and found none, "as Appellant's convictions for both burglary and felony murder with the underlying crime of robbery do not violate the statutory prohibition against double punishment." *Stubblefield*, slip op. at 2 (citing Okla. Stat. tit. 21, § 11; *Head v. State*, 146 P.3d 1141, 1145 (Okla. Crim. App. 2006)).

Under Oklahoma law, first degree felony murder, as alleged in this case, requires proof that a homicide occurred in the commission of robbery with a firearm. Okla. Stat. tit. 21 § 701.7(B). The crime of burglary did not depend on the completion of a crime committed inside, in this case robbery and murder. Once Petitioner kicked in the door with the intent to commit a crime, the crime of burglary was complete. Although he committed robbery and felony murder inside the house, those acts were merely evidence of his intent to commit a crime when he entered.

The respondent alleges this claim involves an interpretation of a state statute and is not proper for federal habeas review. In *Watts v. State*, 194 P.3d 133 (Okla. Crim. App. 2008), the OCCA held that "[w]here the defendant commits a series of separate and distinct

15

crimes, section 11 is not violated." *Id*. at 139. Moreover, "Section 11 is not violated where offenses arising from the same transaction are separate and distinct and require dissimilar proof." *James v. State*, 128 P.3d 521, 543 (Okla. Crim. App. 2006) (citations omitted).

The court finds that although the crimes were committed in rapid succession in the course of the criminal episode, each was a separate crime, so the prohibition against double punishment in Section 11 was not violated. The OCCA's holding was not contrary to or an unreasonable application of Supreme Court precedent, and habeas relief cannot be granted. *See* 28 U.S.C. § 2254(d)(1).

**Ground IV: Excessive Sentences**

Petitioner alleges his burglary sentence of ten years and his life sentence for murder are excessive and should be modified. The OCCA found his sentences "were not so excessive as to warrant modification." *Stubblefield*, slip op. at 3 (citing *Bartell v. State*, 881 P.2d 92, 101 (Okla. Crim. App. 1994)). Petitioner was subject to a maximum sentence of 20 years of imprisonment for burglary, and he could have received a sentence of life without parole for the murder. *See* Okla. Stat. tit. 21, § 1436(1) (2001); Okla. Stat. tit. 21, § 701.9(A) (Supp. 2004)

The court finds Petitioner has failed to identify any federal constitutional violation in this claim, which is the core predicate for habeas relief. *See* 28 U.S.C. § 2254(a). He has not even shown that his sentence falls outside the state statutory limits. *See Dennis v. Poppel*, 222 F.3d 1245, 1258 (10th Cir. 2000), *cert. denied*, 534 U.S. 887 (2001) (stating challenges to state sentencing decisions "are not generally constitutionally cognizable, unless it is shown the sentence imposed is outside the statutory limits or unauthorized by law"). This claim is meritless.

**Ground V: Cumulative Error**

Petitioner claims in Ground V that the cumulative effect of the errors alleged above deprived him a fair trial. Because the OCCA found no merit to Petitioner's individual claims of error, this claim was denied on direct appeal. *Stubblefield*, slip op. at 3.

"Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.) (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) *cert. denied*, 522 U.S. 844 (1997)). *See also Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998); *Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002), *cert. denied*, 540 U.S. 833 (2003) ("When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated."). Here, the court has found no grounds for habeas relief, so Petitioner's cumulative-error claim must fail.

**Certificate of Appealability**

The court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, he has not shown "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether [this] court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability cannot be issued.

**ACCORDINGLY**, Petitioner's petition for a writ of habeas corpus (Dkt. 1) is DENIED, and this action is, in all respects, DISMISSED. Furthermore, Petitioner is denied a certificate of appealability.

**IT IS SO ORDERED** this 2nd day of March 2016.

**Dated this 2nd day of March, 2016.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma